IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| Jennifer Cano, Individually and as the Administrator of the Estate of Pedro Cano Rodriguez; Kimberly Cano, Individually; and Peter Junior Cano, Individually, | CASE NO. _____ |
| Plaintiffs, | **JOINT NOTICE OF REMOVAL** |
| vs. | |
| Tyson Foods, Inc.; Tyson Fresh Meats, Inc.; John H. Tyson; Samuel Dean Banks; Noel White; Tom Brower; Elizabeth Croston; Stephen R. Stouffer; Brent R. McElroy; Ed McAtee; Scott Little; Doug White; Laurie Garcia; and Amanda Brown, | |
| Defendants. | |

_____

**JOINT NOTICE OF REMOVAL**

All Defendants jointly remove this civil action under 28 U.S.C. §§ 1331, 1441, 1442, and 1446. This Court has subject matter jurisdiction, and the case is removable because:

(1)   Plaintiffs' Petition at Law ("Petition") challenges actions taken by Defendants at the direction of a federal officer, for which Defendants will have a colorable federal defense (28 U.S.C. § 1442(a)(1)); and

(2)   The Petition raises substantial and disputed issues of federal law under the Defense Production Act that must be decided by a federal forum (28 U.S.C. § 1331).

Removal is timely. Defendants Tyson Foods, Inc., Tyson Fresh Meats, Inc., Brent R. McElroy, Ed McAtee, Scott Little, Doug White, Laurie Garcia, and Amanda Brown were served with the Petition on or after October 20, 2020, and the remaining Defendants waived service of the Petition on November 2, 2020. [*See* Defendants' Acceptance of Service (Nov. 2, 2020), attached as Exhibit A] This Notice is being filed within 30 days of service. *See* 28 U.S.C. § 1446(b)(1); *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999).

Defendants provide the following short and plain statement of the grounds for removal:

## BACKGROUND

The United States continues to struggle with a global pandemic whose size and scope are without modern precedent. Millions have been infected with the novel coronavirus, and more than 240,000 Americans have died of COVID-19. The economic and human fallout from the pandemic has been severe. This case is brought by three relatives of Pedro Cano Rodriguez, who allege that he worked at a Tyson pork-processing facility; that he contracted COVID-19 at work; and that he later died of the disease. His death is a tragedy.

But Plaintiffs' allegations—including allegations of willful misconduct directed not only against Tyson Foods, Inc. and Tyson Fresh Meats, Inc. (collectively "Tyson"), but also against a dozen Tyson employees—are inaccurate and incorrect, and Defendants vigorously dispute Plaintiffs' claims. Tyson has worked from the very beginning of the pandemic to follow federal workplace guidelines and has invested millions of dollars to provide employees with safety and risk-mitigation equipment. Tyson's efforts to protect its workers while continuing to supply Americans with food in the face of the pandemic continue to this day.

Removal is proper because this case seeks to countermand federal statutes and federal directions Tyson received as part of a national emergency response to an

unprecedented pandemic.  The Petition alleges in effect that Tyson should have shut down its facility in Columbus Junction, Iowa sooner during the COVID-19 pandemic or operated it differently.  But that facility was operating as part of the federally designated "critical infrastructure" at the direction of, and under the supervision of, the U.S. Department of Homeland Security and the U.S. Department of Agriculture. Tyson worked hand-in-hand with federal officials from the time of the declaration of a national emergency on March 13 to safely continue operations to secure the national food supply. The President and the Secretary of Agriculture provided detailed instruction for meat-processing facilities to continue operating, incorporating industry-specific guidance from the Centers for Disease Control and Prevention ("CDC") and the Occupational Safety and Health Administration ("OSHA"). And after attempts by states to interfere with this national prerogative, the President again confirmed, "[i]t is important that processors of beef, pork, and poultry . . . in the food supply chain continue operating and fulfilling orders to ensure a continued supply of protein for Americans" and "continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA," and that any "closures [of such facilities] threaten the continued functioning of the national meat and poultry supply chain" and "undermin[e] critical infrastructure during the national emergency." *Executive Order on Delegating Authority Under the DPA with Respect to Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19* ("Food Supply Chain Resources"), 85 Fed. Reg. 26,313, 26,313, 2020 WL 2060381, at *1 (Apr. 28, 2020).[1]

Because Defendants continued to operate the Columbus Junction facility following federal critical infrastructure directions and supervision from federal

---

[1] https://www.whitehouse.gov/presidential-actions/executive-order-delegating-authority-dpa-respect-food-supply-chain-resources-national-emergency-caused-outbreak-covid-19/

officers, including directives from the President and the Secretary of Agriculture and guidance from the CDC and OSHA, a federal court must resolve this case.

## ARGUMENT

### I.   Federal officer removal is proper under 28 U.S.C. § 1442(a)(1).

Under 28 U.S.C. § 1442(a)(1), a civil action may be removed to federal court if the action is asserted against a person acting under the direction of a federal officer:

> A civil action . . . that is against or directed to any of the following may be removed . . . :
>
> (1) The United States or any agency thereof or any officer (*or any person acting under that officer*) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office . . . .

28 U.S.C. § 1442(a)(1) (emphasis added).

Here, federal officer removal is proper because (1) Defendants "acted under the direction of a federal officer," (2) "there was a causal connection between [Defendants'] actions and the official authority," (3) Defendants have "a colorable federal defense to the plaintiff's claims," and (4) each Defendant "is a 'person,' within the meaning of the statute." *Jacks v. Meridian Res. Co.*, 701 F.3d 1224, 1230 (8th Cir. 2012) (citing *Dahl v. R.J. Reynolds Tobacco Co.*, 478 F.3d 965, 967 n.2 (8th Cir. 2007)).

**Federal Direction**. On March 13, 2020, the President "issued a proclamation that the COVID-19 outbreak in the United States constituted a national emergency beginning March 1, 2020." [Petition ¶ 43] Soon after, on March 16, the President issued "Coronavirus Guidelines" emphasizing that employees in "critical infrastructure industr[ies]"—including companies like Tyson that are essential to maintaining food-supply chains and ensuring the continued health and safety of all Americans—have a "special responsibility" and "should follow CDC guidance to

protect [employees'] health at work." Exec. Office of Pres., *The President's Coronavirus Guidelines for America* at 2 (Mar. 16, 2020).[2]

This "critical infrastructure" designation derives from the USA Patriot Act passed after 9/11, *see* 42 U.S.C. § 5195c(e), and the administration of critical infrastructure protection by the U.S. Department of Homeland Security, which was created in 2002. "Food and Agriculture" is one of the sixteen recognized "sectors" of critical infrastructure and is subject to a 2013 Presidential Policy Directive intended to "advance[] a national unity of effort to strengthen and maintain secure, functioning, and resilient critical infrastructure."[3] Coordinating protection of the Food and Agriculture Sector has been assigned to the U.S. Departments of Agriculture and Health and Human Services, which have an extensive plan[4] "to protect against a disruption anywhere in the food system that would pose a serious threat to public health, safety, welfare, or to the national economy."[5]

Accordingly, from the time of President Trump's disaster declaration on March 13, Tyson was in close contact with federal officials regarding continued operations as critical infrastructure. For example, on March 15, in response to significant hoarding of food and other items, the President met with food industry executives—including Tyson—to discuss the stability of the supply chain. The President provided the following statement regarding "hand-in-hand" cooperation with the federal government to keep supply chains operating:

---

[2] https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf

[3] https://obamawhitehouse.archives.gov/the-press-office/2013/02/12/presidential-policy-directive-critical-infrastructure-security-and-resil

[4] https://www.cisa.gov/critical-infrastructure-sectors

[5] https://www.cisa.gov/sites/default/files/publications/nipp-ssp-food-ag-2015-508.pdf at 13.

> "All of them are working hand-in-hand with the federal
> government as well as the state and local leaders to ensure
> food and essentials are constantly available," President
> Trump said. "We had a long conversation with them and
> they're going to work 24 hours around the clock, keeping
> their store stocked."[6]

Over the next weeks, Tyson was in frequent contact with federal officers regarding the best way to safely continue operations, in particular with the Department of Agriculture's Food Safety Inspection Service ("FSIS"). In fact, FSIS employees were on-site at Tyson's facilities, and Tyson's employees had personal letters authorizing their service to "critical infrastructure," so that those employees could explain their exemption from local lockdowns should any authorities question them.

Federal officials also continued to emphasize the need for companies in the Food and Agriculture Sector to keep operating pursuant to unified, federal guidance. For example, in an April 7 statement, Vice President Pence stressed that "we need [food industry workers] to continue, as a part of what we call our critical infrastructure, to show up and do your job and know that we're going to continue to work tirelessly in working with all of your companies to make sure that that workplace is safe."[7] Congress even appropriated supplemental funding to FSIS to accommodate the continued presence of FSIS at facilities, including Tyson's facilities, during the pandemic.

But notwithstanding the close collaboration between Tyson and federal officials to safely continue operations, state and local officials began asserting contradictory authority with respect to meat and poultry processing facilities. Those

---

[6] https://www.foodbusinessnews.net/articles/15621-trump-meets-with-food-company-leaders

[7] https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-briefing-april-7-2020/

state actions led to an Executive Order re-emphasizing federal supremacy with respect to meat and poultry facilities. On April 28, President Trump expressly invoked his authority under the Defense Production Act ("DPA") and again directed that it was federal policy that meat and poultry processing companies continue operating subject to the supervision of the Secretary of Agriculture. *See Food Supply Chain Resources*, 85 Fed. Reg. at 26,313, 2020 WL 2060381, at *1. The executive order states in relevant part:

> It is important that processors of beef, pork, and poultry ("meat and poultry") in the food supply chain **continue operating and fulfilling orders** to ensure a continued supply of protein for Americans. . . . [R]ecent actions in some States have led to the complete closure of some large processing facilities.
>
> \*       \*       \*
>
> Such closures **threaten the continued functioning** of the national meat and poultry supply chain, undermining critical infrastructure during the national emergency.
>
> \*       \*       \*
>
> [T]he Secretary of Agriculture shall take all appropriate action . . . to **ensure that meat and poultry processors continue operations** consistent with the guidance for their operations jointly issued by the CDC and OSHA.

*Id.* (emphases added).

Consistent with the *Food Supply Chain Resources* executive order and the prior directives, Secretary of Agriculture Sonny Perdue then promptly issued two letters: one to meat and poultry processing companies directing them to continue operating pursuant to the federal directives, and one to state and local officials across the nation reiterating their obligation to work with the Secretary to ensure meat processing companies' compliance with federal directives. *See* U.S. Dep't of Agriculture, Press Release No. 0243.20 (May 6, 2020) (announcing that the Secretary

had issued a "Letter to Governors" and "Letter to Stakeholders")[8]. Secretary Perdue's Letter to Stakeholders again emphasized that the "Nation's meat and poultry processing facilities and workers play an integral role in the continuity of our food supply chain." U.S. Dep't of Agriculture, Letter to Stakeholders (May 5, 2020).[9]

The U.S. Department of Agriculture also entered into a Memorandum of Understanding with the U.S. Food and Drug Administration ("FDA") setting forth the respective roles of each agency in utilizing the DPA to regulate food producers during the COVID-19 outbreak. *See Memorandum of Understanding Between FDA and USDA Regarding the Potential Use of the Defense Production Act with Regard to FDA-Regulated Food During the COVID-19 Pandemic* (May 18, 2020).[10] Notably, the agreement reiterated that "actions by States or localities could lead to the closure of food resource facilities"; such closures "could threaten the continued functioning of the national food supply chain, undermining critical infrastructure during the national emergency"; and the Department of Agriculture retained "*exclusive delegated authority*" under the DPA to issue orders regarding domestic food producers. *Id.* at 1-2, 4 (emphasis added).

Accordingly, Tyson was operating its facilities—including the Columbus Junction facility—as critical infrastructure at the direction of federal officials. As such, Tyson was "acting under the direction of a federal officer," 28 U.S.C. § 1442(a)(1), and "helping the Government to produce an item that it needs" for the national defense, *Watson v. Philip Morris Cos.*, 551 U.S. 142, 153 (2007); *see also Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 486-87 (1st Cir. 1989) (holding that "the reach of section 1442(a)(1) extends to private persons . . . who

---

[8] https://www.usda.gov/media/press-releases/2020/05/06/secretary-perdue-issues-letters-meat-packing-expectations

[9] https://www.usda.gov/sites/default/files/documents/stakeholder-letters-covid.pdf

[10] https://www.usda.gov/sites/default/files/documents/mou-between-fda-usda-dpa.pdf

act under the direction of federal officers," including companies ordered to "facilitate" or "offer[] technical assistance" to federal agents exercising statutory authority).

Indeed, it is well established that private providers to the government of military products (*see, e.g.*, *Betzner v. Boeing Co.*, 910 F.3d 1010, 1013 (7th Cir. 2018)) or health benefits (*see, e.g.*, *Jacks*, 701 F.3d at 1230) can invoke federal officer removal. Here, Tyson was acting at the direction of federal officers in a time of emergency to provide the food security that the government desired. And with respect to the Defense Production Act in particular, the President made clear on March 24 that companies were acting in the shadow of potential Defense Production Act orders: "The Defense Production Act is in full force, but haven't had to use it because no one has said NO!"[11] That the President ultimately issued a formal Executive Order on April 28 is consistent with the President's "broad authority" under that statute, which can be exercised through either "formal, published regulations" or "informal and indirect methods of securing compliance." *E. Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 992-93 (5th Cir. 1976).

Consistent with the finding of federal officer removal in *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998), the federal government here (1) provided "detailed specifications" governing Tyson's ongoing operations—through the federal direction that the CDC and OSHA guidelines would govern operations, and promulgation of exceedingly detailed guidelines specific to meat and poultry processors; and (2) exercised "on-going supervision" of those operations through the Secretary of Agriculture, *id.* at 400, who was delegated power by the Department of Homeland Security to preserve the Food and Agriculture Sector during the pandemic and by the President to "take all appropriate action . . . to ensure that meat and poultry processors continue operations consistent with the guidance for their

---

[11] https://mobile.twitter.com/realdonaldtrump/status/1242421041193988096

operations jointly issued by the CDC and OSHA." 85 Fed. Reg. at 26,313, 2020 WL 2060381, at *1. The Petition challenges Defendants' failure to shut down the Columbus Junction plant sooner in order to implement various measures. [*See, e.g.*, Petition ¶¶ 53-54] But those alleged actions were taken pursuant to the authority, orders, detailed regulation, and supervision of the President and U.S. Departments of Homeland Security and Agriculture. Defendants were therefore "acting under" federal officers, and are therefore entitled to have this case heard in federal court. 28 U.S.C. § 1442(a)(1).

**Connection or Association**. Following the text of 28 U.S.C. § 1442(a)(1), it suffices if the lawsuit targets actions Defendants took "relating to" the directions of federal officers, which requires that Plaintiffs' allegations be "connected or associated with" Defendants' actions taken "pursuant to a federal officer's directions." *See Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 296 (5th Cir. 2020) (en banc); *see also Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) (same); *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 813 (3d Cir. 2016) (same). Here, there is a direct connection between the Petition's allegations and the actions Defendants took at the direction of federal officers.

As noted above, the Petition alleges that Defendants are liable in tort for allowing employees to continue working and not shutting down the Columbus Junction facility, (¶¶ 49-50, 53-54), even though it was operating as critical infrastructure under federal directions during a national emergency. Likewise, the Petition challenges specific measures that Defendants adopted or allegedly failed to adopt in response to the coronavirus. [*See, e.g.*, ¶ 49(a)-(m)] But the measures that Defendants took were at the direction of federal officers in order to continue safe operations as critical infrastructure during a national emergency. Any dispute that Defendants should have operated differently from the federal directions they received in a national emergency should be for the "federal—not state—courts to answer."

*Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 138 (2d Cir. 2008) (federal courts must resolve "whether the challenged act was outside the scope of Defendants' official duties, or whether it was specifically directed by the federal Government") (citing *Willingham v. Morgan*, 395 U.S. 402, 409 (1969)).

**Colorable Federal Defenses**. Defendants have at least the following federal defenses to the claims in the Petition.

- **Express preemption under the Federal Meat Inspection Act ("FMIA").** The FMIA's express preemption clause preempts state-law requirements that are "in addition to" or "different than" the rigorous and extensive federal requirements under the FMIA. *See* 21 U.S.C. § 678; *see also, e.g.*, 9 C.F.R. § 416.5(c) (setting federal requirements under the FMIA regarding cleanliness, protective attire, and "disease control"). As construed by the Supreme Court, "[t]he FMIA's preemption clause sweeps widely" and "prevents a State from imposing any additional or different—even if non-conflicting—requirements that fall within the scope of the Act." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459-60 (2012). Plaintiffs here would use state tort law to impose additional and different requirements.

- **Preemption under the DPA and the Executive Order.** Plaintiffs' claims are also preempted by the DPA and the President's *Food Supply Chain Resources* executive order and related federal directions. Congress enacted the DPA to preserve "the security of the United States" by ensuring "the ability of the domestic industrial base to supply materials and services for the national defense and to prepare for and respond to . . . natural or man-caused disasters." 50 U.S.C. § 4502(a)(1). The DPA grants the President wide latitude to "take appropriate steps" to maintain and enhance the "domestic critical infrastructure" threatened by "emergency conditions." *Id.* §§ 4502(a)(2)(C), (4). This broad grant of authority preempts any attempt by a state to impose its own regulations on "domestic critical infrastructure" industries when the President has done so under the DPA, 50

U.S.C. § 4502(a)(2)(C); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 376 (2000), and provides defenses against suits like this for actions taken in compliance with orders issued under the DPA. The Petition here seeks to impose state regulation that conflicts with the President's express directives under the DPA requiring Tyson to assist the nation during a national disaster by (1) continuing to operate (2) pursuant to federal operational requirements.

**Defendants are "persons."** All Defendants, including the Tyson entities, are "persons" under 28 U.S.C. § 1442 because the term "includes corporations." *Jacks*, 701 F.3d at 1230 n.3 (citing *Watson*, 551 U.S. at 152-53).[12]

## II. The Court also has federal question jurisdiction.

This case is properly removed under 28 U.S.C. § 1331 because it "aris[es] under" federal law. *See Wullschleger v. Royal Canin U.S.A., Inc.*, 953 F.3d 519, 521 (8th Cir. 2020); *Bd. of Comm'rs of Se. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co.*, 850 F.3d 714, 721 (5th Cir. 2017). Although Plaintiffs' causes of action are styled as state-law claims, this Court has federal question jurisdiction because the claims (1) "necessarily" raise an issue of federal law that is (2) "actually disputed" and (3) "substantial," (4) "which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005); *see*

---

[12] Although all Defendants jointly remove this case, only one Defendant needs to establish a right to remove under 28 U.S.C. § 1442(a)(1), and "the entire case [is] deemed removable, such that [Plaintiffs'] claims against all other defendants . . . will be heard in federal court as well." *Morgan v. Huntington Ingalls, Inc.*, 879 F.3d 602, 606 (5th Cir. 2018); *see also* 14C Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 3726 (Rev. 4th ed.) ("Because Section 1442(a)(1) authorizes removal of the entire action even if only one of the controversies it raises involves a federal officer or agency, the section creates a species of statutorily-mandated supplemental subject-matter jurisdiction.").

*also Wullschleger*, 953 F.3d at 521 (removal is proper where claim pleaded under state law "implicat[es] a disputed and substantial federal issue").

**Federal issues are necessarily raised.** The Petition necessarily raises multiple, substantial federal issues. The entire thrust of the Petition is that Defendants should not have complied with express federal directives related to the national defense—*i.e.*, should have shut down or stopped employees from coming to work (*see* Petition ¶¶ 50, 54, 57); should have taken more or different measures than were mandated by the federal directives (*e.g.*, *id.* ¶¶ 49, 55-56); or failed to comply with federal law by allegedly failing to take certain precautions (*e.g.*, *id.* ¶ 49(*l*)). These issues directly implicate the "uniquely federal interest" in "civil liabilities" arising from the government's defense priorities determinations, *Boyle v. United Technologies Corp.*, 487 U.S. 500, 505-07 (1988), and none of these issues can be resolved "without reliance on and explication of federal law." *Wullschleger*, 953 F.3d at 522.

To the contrary, these federal issues are plainly and necessarily raised by the Petition (*e.g.*, Petition ¶¶ 31, 38), and they permeate every aspect of Plaintiffs' claims—from the equipment Tyson allegedly provided (*e.g.*, *id.* ¶¶ 29 & 52 (discussing OSHA and CDC guidance related to social distancing, face masks, PPE, and physical barriers), 49(*l*) (alleging Defendants failed to abide by "Federal rules, regulations and guidance")), to Defendants' decision "to continue to operate at or very near normal production rates" despite guidance prohibiting large gatherings (*id.* ¶¶ 35-37)). Having "elected to premise" their claims on "interpretations of federal law," Plaintiffs cannot avoid this Court's jurisdiction. *See Wullschleger*, 953 F.3d at 522.

**The federal issues are "substantial."** The Petition implicates federal imperatives of the highest and broadest importance: coordination of national disaster relief and the maintenance of infrastructure "essential to the national defense." 50 U.S.C. § 4511(b); *see also Scrogin v. Rolls-Royce Corp.*, No. 3:10cv442 (WWE), 2010

WL 3547706, at *3 (D. Conn. Aug. 16, 2010) ("[P]laintiffs' state tort claims give rise to serious federal interests in the government procurement contract and military operations."); *McMahon v. Presidential Airways, Inc.*, 410 F. Supp. 2d 1189, 1201-02 (M.D. Fla. 2006) (holding that "the federal issues [were] quite substantial" where national defense and procurement were implicated).

Moreover, "the validity of [Plaintiffs'] claims would require that conduct subject to an extensive federal . . . scheme is in fact subject to implicit restraints that are created by state law." *Bd. of Comm'rs of Se. La.*, 850 F.3d at 724. The "implications for the federal regulatory scheme" of such liability—particularly where the federal scheme relates to critical infrastructure during a national emergency—"would be significant." *See id.*; *Xitronix Corp. v. KLA-Tencor Corp.*, 916 F.3d 429, 441 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 110 (2019) (noting that the substantiality requirement is satisfied where a case "put[s] the legality of a federal action in question, in a manner that would have broader ramifications for the legal system"). Thus, there is a "serious federal interest in claiming the advantages thought to be inherent in a federal forum" for these claims. *Grable*, 545 U.S. at 313; *see also Rose v. SLM Fin. Corp.*, Civ. A. No. 3:05CV445, 2007 WL 674319, at *4 (W.D.N.C. Feb. 28, 2007) ("Where a federal regulatory scheme requires private parties to undertake certain actions in order to comply with the law, the federal courts necessarily have a serious interest in examining the scope of liability that might arise as a result.").

**Actual dispute.** The federal interests are also actually disputed. *See Wullschleger*, 953 F.3d at 522 (finding federal issues actually in dispute where the plaintiffs "explicitly claim[ed] that defendants violated the FDCA, were non-compliant with FDA guidance, and that their refusal to [seek] FDA review was improper"); *Bd. of Comm'rs of Se. La.*, 850 F.3d at 723 (finding federal issues actually in dispute where the parties disagreed as to whether the defendants complied with federal law). The Petition seeks to impose state-law liability on Defendants for actions

taken pursuant to federal directions, and the Petition's overarching theory is that Tyson allegedly failed to comply with federal directions in some respects and should have exceeded (or otherwise deviated from) federal directions in other respects. These issues—what was required under the *federal* orders and whether states can override the *federal* orders—constitute the central dispute in this case.

**Balance of responsibilities.** Finally, exercising jurisdiction over this case will not disturb—and, in fact, will preserve—the congressionally approved balance of federal and state judicial responsibilities. The U.S. has not faced a pandemic like this since the Spanish flu over a century ago, and the emergency federal powers and planning directive are by their nature limited to a narrow set of circumstances. As explained above, Tyson's facilities were designated as "critical infrastructure" essential to the national defense and directed to continue operating in this national emergency. Moreover, through the DPA, Congress delegated to the President "an array of authorities" to "take appropriate steps to maintain" critical infrastructure— because the "national defense" and "security of the United States" depend upon it. 50 U.S.C. §§ 4502(a)(1), (4).

Accordingly, there is a "clear interest" in "the availability of a federal forum" for this case, which directly challenges the President's orders related to this emergency under the DPA and other federal statutes and federal directions related to those orders. *Grable*, 545 U.S. at 319-20; *see also Bd. of Comm'rs of Se. La.*, 850 F.3d at 725 (holding that jurisdiction was appropriate because "the scope and limitations" of federal framework were at stake, and deciding "whether that framework may give rise to state law claims as an initial matter will ultimately have implications for the federal docket one way or the other"). And exercising jurisdiction over Plaintiffs' claims "would not materially affect, or threaten to affect, the normal currents of litigation," *Grable*, 545 U.S. at 319-20, given the "rare" circumstances here.

**III.    Defendants have satisfied the procedural requirements for removal.**

Venue is proper in this district under 28 U.S.C. §§ 95(b)(5) and 1441(a) because the United States District Court for the Southern District of Iowa, Eastern Division, embraces the county in which the state court action is now pending.

Copies of all process and pleadings filed in the state case are attached hereto as **Exhibit A**. LR 81(a)(1); *see also* 28 U.S.C. § 1446(a). No orders have been filed. Defendants also provide the attached LR 81 Statement in accordance with Local Rule 81(a).

Defendants will promptly provide written notice of this filing to all adverse parties and will file a copy of this Notice of Removal with the clerk of the state court where this suit is currently pending. 28 U.S.C. § 1446(d).

CONCLUSION

For the foregoing reasons, Defendants respectfully remove this action bearing case number LACV 082037, from the District Court for Johnson County, Iowa, pursuant to 28 U.S.C. §§ 1331, 1441, 1442, and 1446.

Dated: November 19, 2020                    Respectfully submitted,

/s/  Kevin J. Driscoll
Kevin J. Driscoll          AT0002245
Tamara K. Hackmann      AT0003003
**FINLEY LAW FIRM, P.C.**
699 Walnut Street, Suite 1700
Des Moines, Iowa 50309
Telephone: 515-288-0145
Facsimile: 515-288-2724
Email: kdriscoll@finleylaw.com
       thackmann@finleylaw.com

Christopher S. Coleman
(*pro hac vice* forthcoming)
**Perkins Coie LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: 602.351.8000
Facsimile: 602-648.7000
Email: CColeman@perkinscoie.com

Mary Gaston
(*pro hac vice* forthcoming)
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000
Email: MGaston@perkinscoie.com

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2020, I have mailed by United States Postal Service and have emailed the documents to the following:

Matthew L. Preston
Ann C. Gronlund
Brad J. Brady
**BRADY PRESTON GRONLUND PC**
2735 First Avenue S.E.
Cedar Rapids, IA 52402

*Attorneys for the Plaintiffs*

/s/ Kevin J. Driscoll